WISE, Justice.
Jami Johnston, the defendant, counterclaim plaintiff, and third-party plaintiff below, appeals from a judgment in favor of Castles and Crowns, Inc. ("Castles"), the plaintiff and counterclaim defendant below, and Delaire Tibbetts, the third-party defendant below. We reverse and remand.
Facts and Procedural History
Castles is a children's clothing company formed by Julie Vickers and Amy Bowers. Vickers and Bowers designed the clothes, which were then manufactured at a factory in El Salvador. Castles had two clothing seasons-fall/winter and summer/spring. At the beginning of each season, Castles would submit a purchase order with the factory, which would then produce clothing for that season. Castles' clothing was sold by representatives who would host home parties to sell the clothing. The representatives would receive trunks that included samples of the fashions for that season. Customers would then place orders that would be shipped from the factory directly to the customer. At the end of each season, any unsold inventory was shipped from the factory to Castles' office. Castles would sell some of its leftover inventory through certain liquidators and consignment companies. At one time, Castles operated a factory-outlet store where it would sell some of its leftover inventory. Subsequently, Castles closed the factory-outlet store and opened a boutique store at which it would sell some of its leftover inventory.
Brandi Stuart, Johnston's sister, worked for Castles from 2006 until 2011. Stuart was initially a representative who sold Castles' clothing at home shows. Vickers subsequently offered Stuart a job working in Castles' office. Ultimately, Stuart became the operations manager for Castles. Stuart received a salary from Castles; she was allowed to purchase Castles' clothing at a discount; and she received a bonus each season based on the gross sales for that season. Stuart testified that the bonus was originally 1%, but it was increased to 3% at some point. However, Castles presented evidence indicating that Stuart received a 1% bonus the entire time she worked for Castles. Vickers testified that, on one occasion, Stuart was allowed to take her bonus in Castles' clothing but that every other bonus was in cash. However, Stuart testified that she was allowed to take her bonuses in cash, clothing, or a combination of cash and clothing.
In 2009, Stuart contacted Johnston and asked her if she was interested in selling children's clothing. Subsequently, Johnston formed Children's Liquidations, a consignment company that would provide children's clothes to other consignment companies for sale. Castles presented evidence indicating that, from 2009 to 2010, while she was working with Castles, Stuart had 7,149 pounds of Castles' clothing shipped either to Johnston or to consignment companies used by Johnston. Stuart used Castles' FedEx shipping account to ship the clothing. Tibbetts, who worked at Castles' boutique store, testified that, on one occasion, Johnston came to the store and picked up multiple boxes of Castles' clothing. Vickers testified that she was aware *645 that, during the time Stuart worked for Castles, some clothes were being sent to Johnston from Castles. When asked about her understanding as to what was occurring with those clothes, Vickers replied that, on a couple of occasions, Stuart had asked her if it was okay if she sent some clothes to Johnston, just as she would to other liquidators; that Vickers was aware that Johnston was receiving those clothes; and that Vickers was expecting to receive a check from Johnston upon the sale of the clothes, just as she did from the other liquidators. The evidence at trial established that neither Stuart nor Johnston paid Castles for those clothes or remitted any of the proceeds from Johnston's sales of the clothes to Castles. However, Stuart maintained that the clothes sent to Johnston were part of her bonuses that she had taken in clothing. Additionally, Johnston testified that Stuart told her that she had either received the clothes as part of her bonus or that she had purchased the clothing.
Evidence was presented indicating that Johnston had sent some of the Castles' clothing she had received from Stuart to consignment companies. Johnston did not use the same consignment companies as Castles used. On some occasions, Johnston took some of the items and sold them at a warehouse sale. For the items Johnston had sent to other consignment companies, the consignee would retain a portion of the sales proceeds as a fee and remit the remaining amount to Johnston. Of that amount, Johnston would keep 30% and give Stuart 70%. For items Johnston sold at the warehouse sale, Johnston would retain the original consignee's fee. Of the amount remaining after the deduction of that fee, Johnston would receive 30% and Stuart would receive 70%.
Some of Castles' FedEx records indicated that some packages had been shipped from Castles directly to the consignment companies used by Johnston. There were also some FedEx records that listed Johnston as the sender and Johnston's consignment companies as the recipients.
In January 2011, Vickers terminated Stuart's employment based on issues with her performance. After Stuart's employment was terminated, Tibbetts, who was working at Castles' boutique store, received a telephone call from a woman who asked for "Jami." When told that no one named Jami worked for Castles, the woman asked for Stuart. When told that Stuart was no longer with the company, the woman asked if Castles' clothing was going to be sent for a consignment sale. Tibbetts told the woman she would have to get back with her, and Tibbetts contacted Vickers. Vickers testified that they subsequently started going through Castles' records. Castles' FedEx records showed the shipments to Johnston. Tibbetts also testified that her 2010 end-of-the-year inventory showed a large amount of missing inventory. Additionally, Vickers discovered credit-card statements for Castles that included personal charges made by Stuart. Johnston testified that, at the time of the trial, she still had boxes of Castles' clothing in her home.
Michelle Cox was the owner of New 2 U, a consignment company that put on events in the fall and spring in various locations in Mississippi. From September 2009 to March 2011, Cox and Johnston had an ongoing relationship pursuant to which Johnston shipped Castles' clothing to Cox; Cox sold the clothing at New 2 U consignment events; Cox retained 30% of the sales proceeds; and the remaining 70% of the sales proceeds were sent to Johnston. Cox's business relationship with Johnston ended at the conclusion of the March 2011 event. Cox testified that, during the March 2011 event in Tupelo, she received a telephone call from Tibbetts, who identified *646 herself as working for Castles. Tibbetts asked Cox if they had any Castles' inventory. When Cox replied that they did, Tibbetts told Cox that she needed to pull those items from the sales floor. Cox testified that, when she asked why, Tibbetts asked her how she had obtained Castles' clothing and that she told Tibbetts that Johnston had shipped the items to her. She further testified that Tibbetts told her that Castles was conducting an internal audit; that some discrepancies had come to light; and that Castles wanted to look into it further. Cox testified that she did not know what Tibbetts meant; that Tibbetts never used the word "stolen"; and that she had asked Tibbetts specifically if the items that had been shipped to her had been stolen. Cox went on to testify that
"[i]t was definitely implied that they were saying that [Johnston] wasn't the rightful owner of those items and did not have the right to send them to me."
Cox testified that Tibbetts asked her to pull Castles' items from the sales floor; to return the items to Castles; and to send any proceeds from Castles' items that had been sold up to that point to Castles. Cox refused to pull the items from the sales floor, refused to send the items to Castles, and refused to send the proceeds from the items that had been sold to Castles. Ultimately, Cox remitted 70% of the proceeds from that event to Johnston. At the conclusion of the March 2011 event, Cox stopped selling Castles' items on consignment for Johnston. However, Cox testified that, about one year later, Johnston contacted her and asked her to sell another line of children's clothing that Johnston was representing. Cox said that she started selling that line of clothing.
On April 22, 2011, Castles sued Stuart and Johnston. The complaint alleged claims of conversion; civil conspiracy; "willfulness, negligence, and wantonness"; trespass to chattel; and unjust-enrichment against Johnston and Stuart. It also asserted fraudulent-misrepresentation and suppression claims against Stuart.
On May 26, 2011, Johnston filed her answer. She also asserted a counterclaim against Castles and a third-party complaint against Vickers and Tibbetts. In her counterclaim and third-party complaint, Johnston alleged claims of defamation; "negligence, wantonness, and willfulness"; conspiracy; and tortious interference with business and contractual relations. She also sought recovery against Castles under the theory of respondeat superior.
On June 28, 2011, Castles filed its "Answer to Jami Johns[t]on's Counterclaims and Third-Party Complaint."
Stuart subsequently filed an answer and an amended answer. Stuart included a counterclaim against Castles alleging libel and slander and tortious interference with Stuart's business relationships.
On January 21, 2013, Castles filed its first amended complaint, asserting the same claims as it did in the original complaint. Count one alleged conversion and stated, in pertinent part:
"25. [Stuart and Johnston] appropriated to their own use and benefit pieces of clothing belonging to Castles without lawful justification. The pieces of clothing converted by [Stuart and Johnston] had a value which will be proven at trial.
"26. [Stuart and Johnston] appropriated to their own use and benefit shipping labels belonging to Castles and the use of Castles' shipping account. The appropriated shipping labels and use of Castles' shipping account had a value which will be proven at trial."
Count two asserted a claim of civil conspiracy and stated, in pertinent part:
"31. At all times material, [Stuart and Johnston] did knowingly combine with each other and others, known and unknown, to accomplish by concert the unlawful *647 purpose of appropriating Castles' property as described above, and [Stuart and Johnston] did cause Castles to suffer damage in the form of substantial financial loss, including loss of income, loss of past and future profits, and injury to business reputation."
Count seven alleged unjust enrichment and stated:
"[Stuart and Johnston] hold monies and other property improperly received, appropriated, converted, or usurped from Castles as set forth above. [Stuart and Johnston] were thereby unjustly enriched and secured benefits in the form of those monies, property and/or assets. It would be unconscionable and unjust for [Stuart and Johnston] to retain those benefits.
"WHEREFORE, Castles demands judgment against [Stuart and Johnston] requiring them to disgorge all funds, profits, gain, unjustified expenses, and all other monies and/or property that are rightfully the property of Castles, and pay damages and/or restitution as equitable relief appropriate under Alabama law, and award Castles' costs, expenses and attorneys' fees. Castles demands the imposition of a constructive trust in favor of it as to all money received by [Stuart and Johnston] from the sale of Castles' property, and such other relief as it may be entitled."
Castles, Vickers, and Tibbetts filed a motion for a summary judgment as to the counterclaims filed by Stuart and Johnston and the third-party claims filed by Johnston. The trial court granted the motion "as to Brandi Stuart and Jami Johnston's claims for libel, negligence, wantonness, and willfulness." However, it denied the motion as to the remaining claims.[1]
Trial of this case started on August 29, 2016. After the close of the evidence, Castles and Johnston each filed a motion for judgment as a matter of law. The trial court entered a judgment as a matter of law as to Johnston's remaining third-party claims against Vickers and Stuart's remaining counterclaims against Castles. Johnston did not pursue her conspiracy claim against Tibbetts and Castles. Castles did not pursue its willfulness, negligence, and wantonness claim and its trespass-to-chattel claim against Johnston and Stuart. It also did not pursue its fraudulent-misrepresentation claim, its suppression claim, and its unjust-enrichment claim against Stuart. Castles' conversion and civil-conspiracy claims against Johnston and Stuart; Castles' unjust-enrichment claim against Johnston; and Johnston's defamation claim and tortious-interference-with-business-and-contractual-relations claim against Castles and Tibbetts were submitted to the jury. During its oral charge, the trial court stated:
"Castles and Crowns also has a claim for unjust enrichment against Defendant Jami Johnston only. In the event you find in favor of Ms. Johnston on the conversion, conspiracy claims."
(Emphasis added.) It also stated:
"All right. In the event you find in favor of Defendant Jami Johnston on the claims of conversion, conspiracy, Castles also then asserts a claim that Jami Johnston was unjustly enriched. And to prevail on the unjust enrichment, Castles must then prove by a preponderance of the evidence that Jami Johnston knowingly accepted, knowingly accepted and retained a benefit provided by Castles *648 and Castles had a reasonable expectation of compensation."
(Emphasis added.)
The verdict form provided, in pertinent part:
"We, the jury, find in favor of the Plaintiff, Castles and Crowns, Inc., and against Defendant Brandi Stuart ___ (check if applicable) and Defendant Jami Johnston ___ (check if applicable) for conversion.
"OR
"We, the jury find in favor of the Defendant ___ Brandi Stuart (check if applicable) and Defendant Jami Johnston ___ (check if applicable) on the conversion count.
"We, the jury, find in favor of the Plaintiff, Castles and Crowns, Inc., and against Defendant Brandi Stuart ___ (check if applicable) and Defendant Jami Johnston for engaging in a conspiracy to convert Castles inventory ___ (check if applicable).
"OR
"We, the jury, find in favor of the Defendant ___ Brandi Stuart (check if applicable) and Defendant Jami Johnston ___ (check if applicable) on the conspiracy to convert inventory count.
"We, the jury, award to the Plaintiff, Castles and Crowns, Inc., compensatory damages in the amount of _________ and, if applicable, punitive damages in the amount of _________.
"If you do not find against Jami Johnston on either of the above counts, you must decide whether she is liable for unjust enrichment. We, the jury, find in favor of the Plaintiff, Castles and Crowns, Inc., and against Defendant Jami Johnston for unjust enrichment ___ (check if applicable).
"We, the jury, award to the Plaintiff, Castles and Crowns, Inc., _______ in compensatory damages on the unjust enrichment count.
"OR
"We the jury find in favor of Defendant Jami Johnston ___ (check if applicable) on the unjust enrichment count."
(Emphasis added.) During its charge to the jury, the trial court reviewed the verdict form, stating, in pertinent part:
"And here it says: 'If you do not find against Jami Johnston on either of the above counts, you then get into the unjust enrichment. We, the jury find in favor of the Plaintiff Castles and Crowns and against Jami Johnston for unjust enrichment'-
"Check mark if that's your verdict.
"-based on the evidence.
"Below that, we, the Jury, award to the Plaintiff Castles and Crowns, blank, and compensatory damages on the unjust enrichment claim.
"If you check that claim.
"Or, we, the Jury, find in favor of the Defendant Jami Johnston, if that's your verdict based on the evidence on the unjust enrichment count."
The jury returned a verdict in favor of Castles and against Johnston and Stuart on the conversion and conspiracy claims. It awarded Castles $800,000 in compensatory damages and $1 in punitive damages. It also found in favor of Castles and against Johnston on the unjust-enrichment claim and awarded Castles $75,000 in compensatory damages. The jury also found in favor of Castles and Tibbetts and against Johnston on the defamation and tortious-interference-with-business-and-contractual-relations claims.
After the jury was discharged, the following occurred:
"THE COURT: All right. The jury came back with a verdict in favor of Castles and Crowns and also-Castles and Crowns on the conversion and the conspiracy claim. And then also further came back in favor of Castles and *649 Crowns against Jami Johnston on the claim for unjust enrichment, which is not consistent with my instructions and the law. So I'm going to set aside that verdict and render judgment in favor of Jami Johnston on the unjust enrichment claim.
"Any other challenges to the verdict, of course, you have time to do it, but I'm going to go ahead and get that done now.
"[COUNSEL FOR STUART]: Well, so you're curing the inconsistent verdict?
"THE COURT: Yes, I'm curing the inconsistency. I think that's-
"Now, if you want to challenge that I'm wrong doing that, yes, you certainly have the right to do that. It could be that the whole thing gets thrown out, as you might already-later.
"[COUNSEL FOR STUART]: Well, I mean, if it's-I don't know. I'm just, in my mind, I'm saying it's an inconsistent verdict.
"[COUNSEL FOR JOHNSTON]: Very inconsistent.
"[COUNSEL FOR STUART:] It's an inconsistent verdict, so, you know ....
"THE COURT: It's inconsistent, no question.
"[COUNSEL FOR CASTLES]: Yeah, the jury made a mistake; however, y'all agreed to the verdict form. Raised no objections to the verdict form.
"THE COURT: I don't think there's anything wrong with the verdict form.
"[COUNSEL FOR STUART]: They didn't follow instructions, so, you know, that may not-that's just ....
"THE COURT: Yes. That could be an issue, maybe it's not an issue, I don't know, but it certainly was not consistent. And I think, you know, I'm setting aside this unjust enrichment. But, yeah, I fully expect there to be further discussion about whether that's the right thing to do or not. Now, let's just leave it like that and file what you need to file within 30 days. Okay?
"[COUNSEL FOR STUART]: Thank you.
"[COUNSEL FOR CASTLES]: Thank you."
On September 1, 2016, the trial court entered a final judgment on the verdict. In its judgment, the trial court stated:
"The jury also returned a verdict against Defendant Jami Johnston in the amount of $75,000 for unjust enrichment, even though the Court instructed the jury (as did the verdict form) to consider the unjust enrichment claim only if the jury did not return a verdict against Jami Johnston on the claims for conversion and conspiracy. The jury did return a verdict against Jami Johnston on the claims for conversion and conspiracy; thus, the verdict against Defendant Jami Johnston for unjust enrichment is inconsistent with the other findings by the jury and the Court's instructions. Therefore, the Court will not enter a judgment on the jury verdict against Defendant Jami Johnston for unjust enrichment."
On September 30, 2016, Johnston filed a Rule 59, Ala. R. Civ. P., motion to alter, amend, or vacate the judgment as to her or for a new trial. She argued that she was entitled to a new trial based on an inconsistent verdict. In her motion, Johnston argued that a trial court cannot cure an inconsistent verdict or any other erroneous verdict by modifying the verdict. Johnston also filed a Rule 50, Ala. R. Civ. P., renewed motion for judgment as a matter of law.
On October 3, 2016, Castles, Vickers,[2] and Tibbetts filed a Rule 59 motion to *650 alter or amend "certain language contained in the Court's Final Judgment in this case." In that motion, they asked the court to take out the language in its judgment that characterized the verdict "as 'inconsistent' with the jury's other findings and the Court's instructions."
On November 1, 2016, Castles and Tibbetts filed their opposition to Johnston's Rule 59 motion. They asserted that the verdict was not inconsistent. They also asserted that the motion should be denied because the trial court allowed the jury to decide the legal claims and then properly disposed of the equitable claim of unjust enrichment. They also asserted that the verdict form allowed the result claimed to be inconsistent and that Stuart and Johnston did not object to the verdict form. Castles also filed an opposition to Johnston's renewed motion for a judgment as a matter of law.
On November 2, 2016, Johnston filed a "Reply/Supplement" to her Rule 59 motion and a response to Castles, Vickers, and Tibbetts' Rule 59 motion.
On November 4, 2016, the trial court denied Johnston's motion to alter, amend, or vacate the judgment or for a new trial; denied Johnston's renewed motion for a judgment as a matter of law; and denied the motion to alter or amend the judgment filed by the Castles, Vickers, and Tibbetts. This appeal followed.[3]
Discussion
I.
Johnston argues that the trial court erred when it did not grant her motion for a new trial after expressly determining that the jury's verdict was inconsistent. Specifically, she asserts that the jury was bound to abide by the trial court's instructions and that the jury did not follow the trial court's instructions regarding the unjust-enrichment claim.
This Court addressed a similar situation in Clark v. Black, 630 So.2d 1012 (Ala. 1993). Clark involved an accident that occurred when a motorcycle being driven by Michael Clark collided with an automobile being driven by Tommie Black. Michael, by and through his parents as next friends, and his parents, individually, sued Black. The plaintiffs included a negligence claim against Black and sought damages for physical and mental suffering, loss of services and society, and medical expenses. They also alleged that Black had acted wantonly, and they requested punitive damages. The case eventually went to trial. During the trial, the trial court directed a verdict in favor of Black as to the wantonness claim. The jury then found in favor of Michael and his parents as to the negligence claim. It then awarded Michael $5,000 as past damages and $15,000 in future damages. It assessed Michael's parents' damages as $0. Subsequently, the Clarks moved for a new trial and argued, in pertinent part:
" 'The jury's verdict in favor of Michael, Tillman, and Carolyn Clark with an award of damages to Michael Clark but without an award of damages to Tillman and Carolyn Clark constitutes an inconsistent verdict as a matter of law.' "
Clark, 630 So.2d at 1014. The trial court denied the Clarks' postjudgment motion. On appeal, the Clarks argued that the jury's verdict was inconsistent and therefore invalid. This Court addressed this issue as follows:
*651 "The jury resolved the liability issue in favor of all three plaintiffs; it awarded Michael $20,000, but awarded his parents, suing individually, $0, notwithstanding virtually uncontroverted evidence that Michael's medical expenses had exceeded by $5,000 the amount paid or covered by insurance. See generally Ala. Code 1975, § 12-21-45 (abolishing the 'collateral source rule'). The Clarks contend that such a verdict was inconsistent as a matter of law, and, consequently, that their motion for a new trial was due to be granted. Black contends that Michael's$20,000 award included compensation for medical expenses, and, therefore, she insists that the verdict is not inconsistent, because, she argues, in the complaint Michael, not his parents, sought compensation for medical expenses. We disagree with Black's contention.
"Regardless of the posture of the claims in the complaint for medical expenses, the trial judge, without objection, charged the jury that the parents were entitled to compensation for medical expenses incurred in the treatment of the minor. More specifically, he stated:
" 'Now, in this case, you have a suit that is brought by the parents of Michael Clark on his behalf. The evidence in the case is that Michael Clark is a minor and the law requires that the parents sue as next friend of the minor. Therefore, we have the claim of Michael Clark [that] is brought ... by the parents. Also, we have the claim of the parents, individually.
" '... [T]he parents, in their individual rights, are bringing a claim for medical expenses, nursing services provided to the child, and loss of services of their minor child for temporary disability, and loss of services for their minor child for permanent disability.
" '....
" 'The measure of damages for medical expenses is all reasonable expenses necessarily incurred for doctors and medical bills which the plaintiff[s have] paid or become obligated to pay and the amount of reasonable expenses of medical care, treatment, and services reasonably certain to be required in the future. The reasonableness of, and the necessity for, such expenses are matters for your determination from the evidence.
" '....
" 'If you are reasonably satisfied from the evidence that the plaintiff[s] paid, or became obligated to pay, medical expenses for the care and treatment of [their] minor child as a proximate consequence of the negligence of the defendant, then the plaintiff[s] would be entitled to recover the reasonable expense for such care and treatment as shown by the evidence as being reasonably necessary.'
"(Emphasis added.)
"Unchallenged jury instructions become the law of the case. Louisville & Nashville R.R. v. Atkins, 435 So.2d 1275 (Ala. 1983). The jury is bound to follow such instructions, even if they are erroneous. Lee v. Gidley, 252 Ala. 156, 40 So.2d 80 (1949) (erroneous instructions became the law of the case, and a judgment entered on the jury's verdict comporting with those instructions would not be reversed on appeal). 'A verdict contrary to [the court's instructions] would have to be set aside on motion' of the prejudiced party. New Hampshire Fire Ins. Co. v. Curtis, 264 Ala. 137, 142, 85 So.2d 441, 446 (1955).
"Pursuant to these principles, the jury was bound by the trial court's instructions *652 to award damages to Tillman and Carolyn Clark for medical expenses if it resolved the liability issue in the Clarks' favor. Because it so resolved this issue, we hold that the jury's failure to award the parents any amount was inconsistent with the virtually uncontroverted evidence that medical expenses exceeded by approximately $5,000 the amount paid by insurance, and was contrary to the court's instructions. Consequently, the trial court erred in denying the Clarks' motion for a new trial."
630 So.2d at 1017-18 (some emphasis added; footnotes omitted). See also Monteleone v. Trail Pontiac, Inc., 395 So.2d 1003, 1005 (Ala. Civ. App. 1980) (holding that, "[w]here the jury disregards the instructions of the trial court, the court falls into error if it denies appellant's motion for new trial which raises the legality of the verdict. Edwards Chevrolet Co. v. Brokaw, 47 Ala. App. 631, 259 So.2d 838 (1972).").
"A verdict has been described as 'inconsistent' when the jury 'inconsistently resolved the same issue in two separate counts,' State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 319 (Ala. 1999), when the verdict appears to be 'the result of confusion,' City of Bessemer v. Foreman, 678 So.2d 759, 760 (Ala. 1996), or when the record in a case does not reveal a situation in which the jury's decisions can coexist, Ex parte Alfa Mut. Ins. Co., 799 So.2d 957, 962 (Ala. 2001). See also Smith v. Richardson, 277 Ala. 389, 391, 171 So.2d 96, 97 (1965) (stating that differing verdicts on separate but identical claims filed by separate parties were 'clearly inconsistent, having been rendered at the same time by the same jury, on identical facts, [and having] render[ed] speculative what the jury intended by its verdicts. Patently, the verdicts indicate confusion on the part of the jury.'). When a jury verdict is inconsistent, the proper remedy is a new trial. Bessemer, 678 So.2d at 760. This is so because 'any attempt to reconcile the inconsistencies in a verdict must be based on mere speculation about the jury's intent.' Id. ; see also A.L. Williams & Assocs., Inc. v. Williams, 517 So.2d 596, 598 (Ala. 1987) ('Where the jury verdict is the result of confusion or is inconsistent in law, the trial court should grant a new trial. A new trial is necessary, because once the jury is dismissed any attempt to reconcile the inconsistencies in a verdict amounts to mere speculation about the jury's intent.' (citation omitted))."
Jones Express, Inc. v. Jackson, 86 So.3d 298, 303-04 (Ala. 2010) (emphasis added).
"As this Court stated in Underwriters Nat'lAssurance Co. v. Posey, 333 So.2d 815, 817 (Ala. 1976) :
" 'When two actions are tried together, and inconsistent verdicts are rendered, sound practice requires that both verdicts be set aside without attempt by analysis of the evidence to determine which result the jury intended. This rule of law is based upon the principle that, where verdicts are inconsistent on their face the jury has misconceived the issues presented, or was prompted by bias.' "
Barnes v. Oswalt, 579 So.2d 1319, 1323 (Ala. 1991). Further,
"[t]his Court has written:
" 'Where a jury verdict is the result of confusion or is inconsistent in law, the trial court should grant a new trial; a new trial is necessary because, once the jury is dismissed, any attempt to reconcile the inconsistencies in a verdict must be based on mere speculation about the jury's intent.'
" City of Bessemer v. Foreman, 678 So.2d 759, 760 (Ala. 1996). See also Clark v. Black, 630 So.2d 1012 (Ala. 1993) ; Humana Med. Corp. v. Traffanstedt, 597 So.2d 667 (Ala. 1992)."
*653 Ex parte Alfa Mut. Ins. Co., 799 So.2d 957, 962 (Ala. 2001).
In this case, the trial court instructed the jury to consider Castles' unjust-enrichment claim against Johnston if it did not find against Johnston on the conversion and conspiracy claims. The jury found against Johnston on both the conversion and conspiracy claims. However, it then considered the unjust-enrichment claim and found against Johnston on that claim as well. Thus, the jury's verdict was inconsistent with the trial court's instructions and was obviously the result of confusion on the part of the jury. After it had discharged the jury, the trial court acknowledged the inconsistency in the jury's verdict. The trial court attempted to cure that inconsistency by setting aside the award in favor of Castles on the unjust-enrichment claim. However, as this Court noted in Jones and Ex parte Alfa Mutual, the trial court's attempt to reconcile the inconsistency in the jury's verdict was based on mere speculation about the jury's intent. Additionally, the jury failed to follow the trial court's instructions, and Johnston moved for a new trial on that ground. Based on the decisions in Clark and Monteleone, Johnston was entitled to a new trial because the jury failed to follow the trial court's instructions. For these reasons, the trial court erred when it denied Johnston's motion for a new trial.
II.
Johnston also argues that, if this Court determines that she is entitled to a new trial, the new trial "must encompass both the claims asserted by Castles against Johnston and the counterclaims/third-party claims asserted by Johnston against Castles and ... Tibbetts." (Johnston's brief, at p. 32.)
" Rule 59(a) likewise addresses new trials: 'A new trial may be granted to all or any of the parties and (1) on all of the issues in an action where there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of Alabama.' (Emphasis added.) The rule is not prefaced by words such as 'on motion for new trial by one of the parties' or by any other words that would limit its application. It, too, requires a new trial as to all parties and all issues in this case."
Price-Williams Assocs., Inc. v. Nelson, 631 So.2d 1016, 1019-20 (Ala. 1994). Thus, Johnston is entitled to a new trial as Castles' conversion, conspiracy, and unjust-enrichment claims against her and as to her tortious-interference-with-business-and-contractual-relations and defamation claims against Castles and Tibbetts.
Conclusion
Based on the foregoing, the trial court erred when it denied Johnston's motion for a new trial. Accordingly, we reverse the trial court's judgment as to Castles' conversion, conspiracy, and unjust-enrichment claims against Johnston and her tortious-interference-with-business-and-contractual-relations and defamation claims against Castles and Tibbetts and remand this case for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Stuart, C.J., and Bolin, Parker, Murdock, Shaw, Main, and Bryan, JJ., concur.
Sellers, J., dissents.

Apparently, the summary judgment disposed of Stuart's counterclaim against Castles alleging libel, but not Stuart's counterclaim alleging slander against Castles or Johnston's counterclaim/third-party claim alleging defamation against Castles, Vickers, and Tibbetts.

Although Vickers is shown as a movant on the Rule 59 motion, all claims against her appear to have been resolved by summary judgment and a judgment as a matter of law.

Stuart also filed a notice of appeal in this Court, which was docketed as case no. 1160227. On June 23, 2017, counsel for Castles and Tibbetts filed a motion to dismiss the appeal, which this Court granted on July 28, 2017.